# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-1458V
### Filed: August 23, 2019
UNPUBLISHED

DENISE GORING,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

Special Processing Unit (SPU);
Decision Awarding Damages; Pain
and Suffering; Tetanus Diphtheria
acellular Pertussis (Tdap) Vaccine;
Shoulder Injury Related to Vaccine
Administration (SIRVA)

*Isaiah Richard Kalinowski, Maglio Christopher & Toale, PA, Washington, DC, for petitioner.*
*Voris Edward Johnson, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On November 4, 2016, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to a tetanus, diptheria, acellular pertussis ("Tdap") vaccination she received on October 19, 2015.[3] Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Petitioner received three vaccinations on October 19, 2015: Tdap, shingles, and influenza. Petitioner's exhibit ("Ex.") 1 at 1.

For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount **$75,200.00**, **representing compensation in the amount of $75,000.00 for actual pain and suffering and $200.00 for past unreimbursable expenses.**

## I.      Relevant Procedural History[4]

Petitioner filed a petition for compensation for a shoulder injury related to vaccine administration ("SIRVA").  (ECF No. 1).  Respondent submitted a Rule 4(c) report on August 10, 2017 asserting that petitioner had not established entitlement to compensation due to an inadequate onset period for a SIRVA injury, uncertainty of the vaccination site, and an alternate cause for petitioner's shoulder injury.  (ECF No. 29).

The undersigned held a fact hearing on September 18, 2018 with petitioner as the sole witness.  *Goring v. Sec'y of Health & Human Serv.*, No. 16-1458V, 2018 WL 6539219, *2 (Fed. Cl. Spec. Mstr. Oct. 31, 2018).  The undersigned found that petitioner's Tdap and shingles vaccines were administered to her left arm and the onset of petitioner's left shoulder injuries occurred within 48 hours of her October 19, 2015 vaccinations. *Id* at *1.  The undersigned further ruled that a lipoma on petitioner's back was not a condition that explained her left shoulder symptoms.  *Id.*

On May 6, 2019, the undersigned determined that petitioner was entitled to compensation since she established that she suffered a shoulder injury caused by a covered vaccine and respondent did not show that unrelated factors caused her injury. Ruling on Entitlement at 2 (ECF No 78).  On May 7, 2019, the parties were ordered to discuss the appropriate amount of compensation in this case.  (ECF No. 72).

Petitioner filed a joint status report on June 6, 2019 indicating the parties were unable to agree on the amount of damages.  (ECF No. 73).  On June 27, 2019, the undersigned ordered each party to file briefs to be considered in a decision awarding compensation.  (ECF No. 74).

The parties have filed their respective briefs and this case is now ripe for a determination regarding an award of damages.  (ECF Nos. 76, 77).


## II.     Relevant Medical History

Petitioner received three vaccines on October 19, 2015 including a Tdap vaccine in her left shoulder.  Ex. 1 at 1, *Goring*, 2018 WL 6539219 at *3.  Petitioner's prior medical history does not include any mention of left shoulder problems and is not otherwise relevant to her claim.

---

[4] The undersigned adopts the comprehensive procedural history set forth in the Ruling on Entitlement issued on May 6, 2019.  (ECF No. 78).

Although petitioner asserted in an affidavit that she experienced painful symptoms almost immediately, she was not seen by a medical provider for the pain until December 22, 2015 when she presented to her primary care physician, Karen Noriega, M.D. at Mercy Hospital. Ex. 3 at 42.  Petitioner complained to Dr. Noriega of left arm pain after receiving vaccinations two months ago, stating that the "pain is worsening where she cannot lift her left arm over her head." *Id.*  Petitioner described an "aching" pain and rated it at 6 on a pain scale of 1 to 10. *Id.* at 49.  Dr. Noriega examined petitioner and found she had decreased range of motion ("ROM") in her left shoulder and tenderness to deep palpation. *Id.* at 45.  Dr. Noriega diagnosed her with left arm pain and ordered a CT scan of petitioner's left shoulder. *Id.*

On January 19, 2016, petitioner presented to the emergency room ("ER") at Mercy Hospital and Medical Center with a chief complaint of left arm pain. Ex. 3 at 278. She described significant left shoulder pain and limited range of motion that started when she received a vaccination in October 2015. *Id.* at 298.  It was noted in the record that she was previously seen for left shoulder symptoms. *Id.*  At the prior visit, a CT was ordered but not completed due to insurance issues. *Id.*

On examination at the ER, the internal and external rotation of petitioner's left shoulder was noted to be limited due to pain. Ex. 3 at 298.  A left shoulder x-ray revealed only mild degenerative joint changes and a chest CT showed a lipoma on her back. *Id.*  The examining physician determined that petitioner had "shoulder pain likely related to rotator cuff pathology, possibly related to large lipoma" and suggested she continue with pain medications. *Id.*  Petitioner was discharged and directed to follow up with her primary care physician. *Id.* at 296.

Petitioner followed up with another physician at Mercy Hospital, Kimberly Townsend-Scott, M.D., on January 26, 2016, complaining of left shoulder pain. Ex. 3 at 326.  Dr. Townsend-Scott reviewed the test results from the ER visit and referred petitioner to a surgeon for evaluation and possible excision of the lipoma. *Id.*  She suggested physical therapy ("PT") if petitioner's symptoms continued following surgery. *Id.* at 332.

On February 2, 2016, petitioner sought treatment from an individual she described as a "natural doctor" at the Center for Progressive Health.  Transcript of Fact Hearing ("Tr.") 42.  At that visit she reported she could not raise her left arm above horizontal. Ex. 2 at 4.  The provider assessed her as having left rotator cuff syndrome secondary to the vaccines in the left shoulder. *Id.* at 3.

In response to Dr. Townsend-Scott's recommendation, petitioner saw a surgeon, Andrew Perrott, M.D., on February 18, 2016. Ex. 14 at 3.   Dr. Perrott examined her and concluded that excision of the lipoma was "unlikely to change shoulder problem." *Id.* at 4.  Dr. Perrott noted restrictions in petitioner's left shoulder movements with abduction limited to 60 degrees. *Id.*  He proposed that rotator cuff syndrome might be the cause of her discomfort and recommended a referral to either an orthopedist or physical therapy. *Id.*  Petitioner told him she would like to try physical therapy first and Dr. Perrott placed the order. *Id.* at 4, 7.

Petitioner reported to physical therapy ("PT") on March 28, 2016 for an initial evaluation. Ex. 5 at 54. She rated her pain at a 7/10 and described having pain with movement. *Id.* The physical therapist, Shawn White, P.T., assessed her with left shoulder ROM limitations. Her flexion ROM was limited to "86 degrees with pain" and her abduction ROM was limited to "60 degrees with pain." *Id.* at 55. Mr. White rated petitioner's left upper extremity strength as only "fair" and noted she had tenderness with palpation over the left deltoid insertion and upper trapezius muscle. *Id.* He noted she had positive signs on Hawkins and Kennedy impingement tests. *Id.* In his overall assessment, Mr. White wrote that petitioner had "difficulty with ADLs and functional task[s] of reaching, washing hair, pulling and carrying items that are 10 lbs. or more." *Id.* at 56.

Petitioner returned to see Mr. White on April 26, 2016. Ex. 5 at 20. She initially reported moderate pain, rating it as 5/10. *Id.* She experienced some pain relief and increased ROM in her left shoulder flexion and abduction as a result of the session. *Id.* at 21. On April 28, 2016, she rated her pain at 1/10 but she denied improvement with left shoulder ROM. *Id.* at 22. Mr. White instructed her to perform shoulder exercises and stretches at home. *Id.*

On May 3, 2016, petitioner reported decreased pain and improved range of motion at PT. Ex. 5 at 30. She rated her left shoulder pain at 0/10 on May 5, 2016 and said she only had pain with strenuous activity. *Id.* at 32. Petitioner reported on May 10, 2016 that she was "now able to take her coat off without pain in her [left] shoulder" although Mr. White noted that she had pain during the PT session. *Id.* at 34. On May 19, 2016, petitioner told Mr. White she had pain above her left clavicle over the weekend, but it decreased when she rubbed the spot. *Id.* at 38. Mr. White noted she also had pain with manual therapy during the session and she seemed to have increased fluid in her left shoulder compared to previous sessions. *Id.* at 38. She rated her pain level at 1/10 when she returned to PT on May 24, 2016 but by June 7, 2016, she again reported a pain score of 0/10. *Id.* at 39, 5.

Petitioner attended a total of 12 PT sessions with Mr. White and was discharged on June 9, 2016. Ex. 5 at 7-57. At the final PT session, petitioner said she was feeling well with no left shoulder pain. *Id.* at 7. Her active ROM had improved but was still limited to 95 degrees in flexion and 93 degrees in abduction. *Id.* at 8. Mr. White noted the following in the discharge assessment:

> Upon discharge patient is able to perform increased ADLs including ease in putting on bra, zipping dresses, and donning jackets. Patient has increased ROM of [left] shoulder compared to initial evaluation in shoulder flexion and abduction. Patient has decreased pain of 0/10 in [left] shoulder compared to a 7/10 achy pain in the shoulder during initial evaluation on March 28, 2016. Patient showed a decrease in functional limitations with Shoulder Pain and Disability Index from 86.9% to 79% upon discharge. Patient is now [independent] with [home exercise program] and instructed to continue

home exercises and stretches to continue to decrease functional impairment in [left] shoulder.

*Id.* at 9.

Petitioner mentioned her left shoulder condition at appointments with several other providers but did not receive treatment.  For example, she presented to Universal City Family Practice on April 18, 2016 to follow up on some unrelated labs.  Ex. 7 at 3. The notes from the visit were handwritten and are difficult to read but there seems to be a notation about a left shoulder problem.  *Id*. at 4.   It appears no treatment was suggested for the left shoulder.  *Id*.

On November 7, 2016, petitioner was seen by a rheumatologist, Rediet Kokebie, M.D., for right wrist and right knee pain.  Ex. 10 at 1.  Petitioner attributed the right wrist pain to overuse of the right arm to protect the vaccine-injured left shoulder.  Dr. Kokebie did not address the left shoulder condition other than to note petitioner's account.  *Id.* at 1, 2.

Finally, petitioner sought an evaluation of her left shoulder pain and her back lipoma from an orthopedist, Ellis Nam, M.D., on March 8, 2018.  Ex. 23 at 3.  Dr. Nam noted her history of left shoulder pain after a vaccination and that she had PT for about three months that helped her pain.  Dr. Nam added that she still had some weakness and loss of range of motion.  *Id.*  After examining petitioner, Dr. Nam found her shoulder area nontender, determined that she had good passive ROM but positive impingement, and noted a weak rotator cuff.  *Id.* at 4.  He assessed her with left shoulder pain, status post vaccination in October 2015, with a possible cuff tear.  He recommended an MRI to rule out a rotator cuff tear, but she elected not to proceed.  *Id.* at 4.

### III.    Testimony and Affidavit

Petitioner described her vaccination experience and her subsequent left shoulder pain and suffering in an affidavit filed in this case.  Ex. 15.  She also testified at length at a fact hearing on September 18, 2018 about her attempts to obtain treatment for the left shoulder injury and her current limitations.

Petitioner recalled in her affidavit that she experienced pain and inflammation almost immediately after receiving the vaccinations in her left arm.  Ex. 15 at 2.  She asked the clinic technician about the pain and was advised it was normal and would subside in a couple of days.  *Id.* at 2; Tr. 11.  She noticed swelling around the injection site after she left the clinic.  Ex. 15 at 2.  The pain worsened the following day and she had difficulty moving her arm.  Ex. 15 at 2.  She called the clinic and was told it might take a couple of weeks to resolve.  *Id.* at 2-3.

Petitioner stated in her affidavit that in the week following the vaccinations, she "could not move [her] left arm nearly at all, and it was basically incapacitated from that point onward."  Ex. 15 at 3.  She called the clinic after two weeks because the pain and immobility had continued.  *Id*.   She was told again that the symptoms should go away.

*Id.* Petitioner testified that she took aspirin and wore an "ion bracelet" and an "impulse stimulator" to ease the pain that she described as "unbearable." Tr. 15. She contacted her primary care physician, Dr. Noriega, but could not schedule an appointment until late December. *Id* at 15-16.

When petitioner saw Dr. Noriega on December 22, 2015, she could not lift her left arm which interfered with dressing and bathing. Tr. 18. Dr. Noriega referred her for a test, but it was not covered by insurance. Ex. 15 at 3. Petitioner became frustrated with the pain, sleeplessness, and immobility of her left arm so she went to the emergency room on January 19, 2016. Ex. 15 at 3-4; Tr. 23. The CT scan showed a lipoma on petitioner's back leading to uncertainty regarding her diagnosis and she was discharged with pain medication and instructions to return if symptoms worsened. Ex. 15 at 4; Tr. 24.

Petitioner testified that she went to the Center for Progressive Health in February 2016 and paid out of pocket because she was determined to find out what was going on with her left shoulder. Tr. 42. The "natural doctor" at the center told her that she had an issue with her rotator cuff. *Id*.

Petitioner's left arm was still painful with limited functioning when she went to the PT evaluation on March 28, 2016. Tr. 38. She could not get in the tub, reach her pots and pans, put on a necklace, or fasten her bra. Tr. 38-39. The PT helped petitioner with the pain, and she regained use of her arm although she still has limitations. Tr. 45.

Petitioner testified that she purchased an exercise device called the Euro Shaper in order to exercise at home because she was concerned about going to the gym and further injuring her shoulder. Tr. 43. She expressed a belief that the device would assist in healing her shoulder condition but acknowledged that it was not prescribed or recommended by her physicians. Tr. 43, 68. The date of the purchase was May 23, 2016. Ex. 26 at 2.

Petitioner testified that she sought out Dr. Nam in 2018 to clarify whether the lipoma was the cause of her symptoms and he told her she had a rotator cuff tear and should get an MRI. She chose not to get an MRI because the left shoulder pain was gone, and she wanted to forget about it. Tr. 51.

Petitioner described her experience as pain that she would not wish "on [her] worst enemy, because it took [her] through hell." Tr. 53. She also testified that currently she "can do everything practically that [she] used to" except for reaching for her pots and pans. Tr. 48-49.

Upon request from the undersigned at the fact hearing, petitioner demonstrated that the flexion and abduction range of motion of her left arm was limited to 90 degrees or less. She was unable to reach the back of her bra strap with her left hand. Tr. 80-81. The undersigned determined at the hearing that petitioner's testimony was consistent and credible as to the pain, weakness, and reduced range of motion that she experienced. Tr. 84.

## IV.    The Parties' Arguments

Petitioner proposes damages in the amount of $100,000.00 for her actual pain and suffering and $1,300.00 in unreimburseable expenses including $200.00 for a medical appointment at the Center for Progressive Health and $1,100.00 for an item of "rehabilitation exercise equipment."  Memorandum of Law in Support of Petitioner's Motion for Finding of Fact Regarding Damages ("Pet. Mem.") at 4 (ECF No. 76). Petitioner did not make a claim for lost wages.

In support of the amount suggested for her pain and suffering, petitioner makes passing reference to the Court's rulings on damages over the last year but cites no cases.  Pet. Mem. at 5.  Petitioner also emphasizes that she continues to experience "residual deficits in strength, range of motion, and ability with her left arm, as was visually demonstrated at the fact hearing."  *Id.*

Respondent argues that petitioner should be awarded $50,000.00 as compensation for her actual pain and suffering.  Respondent's Brief on Damages ("Res. Brief") at 1 (ECF No. 77).  To justify this lower amount, respondent emphasizes that petitioner did not obtain medical care until almost two months after the causal vaccination, took no pain medications other than aspirin, and was treated with ten PT sessions after which her left shoulder was significantly improved.[5]  Respondent further asserts that petitioner's SIRVA was not severe and to the extent that it has not resolved, is only mildly limiting at present.  Res. Brief at 8.

Respondent compares petitioner's SIRVA to those suffered by petitioners in *Knauss* and *Crefasi*.[6]  Res. Brief at 9.  He argues the facts in this case are most like those in *Knauss* where the petitioner was awarded $60,000.00 for pain and suffering. *Id.*  Respondent also relies on a syncope case involving a fractured skull, purportedly for context.[7]  *Id.* at 8-9.

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).  Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury,

---

[5] Petitioner had 12 sessions of physical therapy.  *See* Ex. 5 at 5-57.

[6] *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Crefasi v. Sec'y of Health & Human Serv.*, No. 15-166V, 2015 WL 5166283 (Fed. Cl. Spec. Mstr. Aug. 12, 2015) (awarding $50,000.00 pursuant to proffer).

[7] *H.S. v. Sec'y of Health & Human Serv.*, No. 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015) (awarding $60,000.00 for pain and suffering).

and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering in this case.  *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned may also rely on her own experience adjudicating similar claims.[8]  *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  *Graves*, 109 Fed. Cl. at 590.  Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id*. at 595.

## VI.   Prior SIRVA Compensation

---

[8] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

### A.  History of SIRVA Settlement and Proffer[9]

SIRVA cases have an extensive history of informal resolution within the SPU.  As of July 1, 2019, 1,170 SIRVA cases have informally resolved[10] within the SPU since its inception in July of 2014.  Of those cases, 689 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[11]  Additionally, 462 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,325.00 to $124,442.25.[12]  The median award is $96,223.27. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[13]  The median award is $70,000.00.  In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

### B.  Prior Decisions Addressing SIRVA Damages

---

[9] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database.  All figures included in this order are derived from a review of the decisions awarding damages within the SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximate.

[10] Additionally, 36 claims alleging SIRVA have been dismissed within the SPU.

[11] Additionally, there have been 19 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[12] Typical range refers to cases between the first and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 19 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83.  For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[13] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

In addition to the extensive history of informal resolution, the undersigned has also issued 19 reasoned decisions as of the end of May of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[14]

###   i.      Below-median awards limited to past pain and suffering

In 11 prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards for actual pain and suffering ranged from $60,000.00 to $90,000.00.[15]  These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema.  The duration of injury ranged from six to 29 months and, on average, these petitioners experienced approximately 14 months of pain.

Significant pain was reported in these cases for up to eight months.  However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less.  Approximately one-half were administered one to two cortisone injections.  Most of these petitioners

---

[14] An additional case, *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, was removed from the SPU due to the protracted nature of the damages phase of that case.  In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses. 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).  A separate reasoned ruling addressed the amount awarded.  2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[15] These cases are: *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for actual pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

pursued physical therapy for two months or less and none had any surgery.  The petitioners in *Weber* and *Garrett* attended PT for five and four months respectively, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA. Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[16]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In four out of five cases, MRI imaging showed possible evidence of partial tearing.[17]  No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 43 days.  Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

---

[16] These cases are: *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[17] In *Reed*, MRI showed edema in the infrapintaus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

### iii.    Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[18]  In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.  In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis.  The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

## VII.    Appropriate Compensation in this SIRVA Case

### A. Past Pain and Suffering

In this case, awareness of the injury is not in dispute.  The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury.  Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

Petitioner received a vaccine on October 19, 2015 and suffered pain in her left shoulder that was immediate and severe. Ex. 15 at 2-3.  She testified that she tried to obtain medical attention for the painful symptoms within days and weeks of the vaccination but was unable to see her primary care physician until two months after the vaccination.  Tr. 12-13.  She described how she took measures on her own to obtain relief from the pain by taking aspirin and wearing an "ion bracelet" and an "impulse stimulator."  Tr. 15.  She testified that the pain "took [her] through hell" and she would not wish it "on [her] worst enemy."  Tr. 53.

When petitioner's primary care physician proved unhelpful in diagnosing and treating her left shoulder, she went to the emergency room to find out what was wrong

---

[18] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

and to obtain relief from the pain. Ex. 15 at 3-4; Ex. 3 at 278, 298. When that effort was also unsuccessful, she paid out of pocket to see a "natural doctor." Tr. 42. Finally, she saw a surgeon who recommended physical therapy which ultimately resolved the pain. Ex. 14 at 4; Tr. 45.

Petitioner described moderate to severe pain in her left shoulder to her medical providers from December 2015 through April 2016. She rated her pain as 6/10 to Dr. Noriega on December 22, 2015 and rated the pain as 7/10 at the PT evaluation on March 28, 2016. Ex. 3 at 49; Ex. 5 at 54. After several sessions of PT, she rated her pain as 5/10 on April 26, 2016. Ex. 5 at 55. Subsequently her pain mostly resolved as a result of PT and home exercise program. She reported pain levels of 0-1/10 at PT in May and June 2016. Ex. 5 at 10, 41, She testified at the fact hearing on September 18, 2018 that the left shoulder pain had gotten better. Tr. 45.

Petitioner also suffered from ROM restrictions in her left shoulder starting shortly after the vaccination. Ex. 15 at 3. She testified the restrictions were severe and interfered with dressing, bathing, and cooking. Tr. 38-39. PT helped with the restricted ROM but, upon discharge, the physical therapist recommended continued home exercises and stretches to keep improving. Ex. 5 at 9. At the fact hearing, petitioner demonstrated that she still could not move her left arm past 90 degrees in flexion and abduction. Tr. 80-81.

Petitioner's case is similar to the prior SPU cases with below-median awards for past pain and suffering. Petitioners in these cases tended to have moderate symptoms with good results from treatment and did not require surgery. The awards in these cases ranged from $60,000.00 to $90,000.00. Petitioner's case is most like the facts found in *Kim*. The petitioner in *Kim* sought treatment 42 days after vaccination, had three months of significant pain (rated at 7-10/10), and her symptoms mostly resolved after 11 sessions of PT over several months. She had a good prognosis with some remaining pain and stiffness. The petitioner in *Kim* was awarded $75,000.00 in pain and suffering.[19]

Respondent primarily relies on *Knauss* to support his proposed award of $50,000.00. However, the petitioner in *Knauss* was awarded $60,000.00 and he rarely rated his pain higher than 1/10.[20] He continued swimming and performing yard work while undergoing treatment and went for extended periods of time without treatment. *Id.* This suggests his symptoms were milder and interfered less with his daily activities than the petitioner in the instant case.

There is preponderant evidence to establish petitioner suffered moderate to severe symptoms of her SIRVA, including significant pain and limited ROM, for six months after vaccination. By the end of this period she showed substantial improvement. She completed PT on June 9, 2016 and was reporting no pain but some residual limitations in her ROM. Ex. 5 at 9. Although she complained of weakness and loss of motion in the left shoulder in a medical visit on March 8, 2018, she elected not to

[19] *Kim*, 2018 WL 3991022, at *1-3
[20] *Knauss*, 2018 WL 3432906 at *7-8.

undergo treatment for it.  Ex. 23 at 4.  Her active treatment for the left shoulder concluded on June 9, 2016, eight months after the vaccination.

Looking at the totality of circumstances, including the severity of petitioner's initial pain and suffering and limited ROM, the undersigned finds $75,000 to be an appropriate amount for petitioner's pain and suffering.

## B.  Future Pain and Suffering

Petitioner mentions future pain and suffering in her brief as being compensable under the Vaccine Act without making a specific request or providing supporting evidence.  Pet. Mem. at 5.  Rather, petitioner emphasizes that she continues to experience residual deficits.  She claims to have provided ample evidence of pain and suffering from the time of onset to the time of the fact hearing.  *Id*.

The record shows that petitioner obtained significant relief from physical therapy. She has not sought further treatment for her left shoulder since her discharge from PT other than a consultation in 2018.  Ex. 5 at 9; Ex. 23 at 4.  At that consult, an MRI was recommended, but petitioner elected not to proceed because her pain was gone.  *Id*. The undersigned finds that petitioner has not met her burden of establishing by preponderant evidence that she is entitled to an award for future pain and suffering.

## C.  Award for Past Unreimbursed Expenses

Petitioner requests reimbursement for two expenses and provided receipts to support the request.  Pet. Mem. at 4; Ex. 26 at 1-3.  The first receipt is for a $200.00 payment to the Center for Progressive Health.  Ex. 26 at 1.  Petitioner testified at the fact hearing that she went to the Center for Progressive Health to obtain treatment for her left shoulder pain.  Petitioner has submitted medical records documenting the visit. Tr. 42; Ex. 2 at 1-4.  Respondent confirmed in his damages brief that he has no objection to this payment.  Res. Brief at 10.

Petitioner's second receipt is for $1,100.00 for an item of exercise equipment called a Euro Body Shaper.  Ex. 26 at 2-3.  Petitioner claims in her damages brief that she purchased the item for the purpose of performing rehabilitation exercises at home "in order to recover from her injury in a safe environment."  Pet. Mem. at 4.  Petitioner testified at the fact hearing that she bought the item because she could not go to the gym and exercise out of fear that someone would hit her shoulder.  Tr. 43.  She also testified that she believed the device would help her shoulder because it was supposed to "improve your blood circulation and lymphatic system."  *Id*.  She conceded that she did not buy it at the recommendation of any of her medical providers.  *Id*.  Petitioner did not provide evidence, other than her own opinion, that the Euro Body Shaper was special equipment that was "reasonably necessary" for diagnosis, medical treatment, or rehabilitation of her injured left shoulder as required in § 15(a)(1)(B)(iii).

Considering the above, the undersigned awards $200.00 in past unreimbursed expenses for the medical visit to the Center for Progressive Health.  The undersigned

finds that petitioner has not met her burden of establishing by preponderant evidence that the Euro Body Shaper was reasonably necessary for diagnosis, treatment, or rehabilitation of her left shoulder.

## VIII.    Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **the undersigned finds that $75,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[21] The undersigned also finds that petitioner is entitled to $200.00 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $75,200.00 in the form of a check payable to petitioner, Denise Goring.**  This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[22]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[21] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.